# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia



FEB 1 3 2019

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 3:19SW058
(1) iPhone cellular phone IMEI #352982098938890 )
containing Sprint SIM card #89011202000210974124 )
(See Attachment A for full identifiers) )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Eastern_____ District of _____Virginia_____ *(identify the person or describe property to be searched and give its location):*

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of __18__ U.S.C. § __922 (a)(1)(A)__, and the application is based on these facts: See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Thomas W. Byrd Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

/S/
David J. Novak
United States Magistrate Judge
*Judge's signature*

Date: __02/13/2019__

City and state: __Richmond, VA__    Hon. David J. Novak, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF (1) iPhone cellular phone IMEI #352982098938890 containing Sprint SIM card #89011202000210974124. Currently located at the ATF Richmond III Field Office, 600 E. Main Street suite 1401, Richmond, Virginia. | Case No. 3:19SW058 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Special Agent Thomas W. Byrd being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

1. I, Thomas Wayne Byrd have been employed as a Special Agent (SA) with the Bureau of Alcohol, Tobacco, and Firearms (ATF) since July 2015 and I am currently assigned to the Richmond III field office. I have investigated individuals for the illegal possession and use of firearms, illegal possession and distribution of controlled substances, and for committing violent crimes. As a SA with ATF I am primarily responsible for conducting criminal investigations that concern the enforcement of our nation's federal firearm laws, drug trafficking and violent crimes.

1

2. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The information provided is based upon my personal knowledge, or that of other sworn law enforcement officers participating in this investigation.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

3. The property to be searched is (1) iPhone cellular phone IMEI #352982098938890 containing Sprint SIM card #89011202000210974124, henceforth referred to as "SUBJECT DEVICE." The SUBJECT DEVICE is currently located at the ATF Richmond III Field Office, 600 E. Main Street suite 1401, Richmond, Virginia.

4. The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B.

### RELEVANT STATUTORY PROVISIONS

**Sale of Firearms to an Individual Whom is believed do not reside in the same State as the Seller:** 18, U.S.C. § 922(a)(5) provides that it is a crime to sell a firearm to a person to which the seller identifies to be an out of state resident.

**Engaged in the Business of Dealing Firearms without a License:** 18, U.S.C. § 922 (a)(1)(A) provides that it is a crime to distribute a quantity of firearms engaged in the business of dealing firearms without a license.

### TECHNICAL TERMS

5. Based on my training and experience, I use the following technical terms to convey the following meanings:

2

a. **Wireless telephone**: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. **Digital camera**: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. **Portable media player**: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

 f. **Sim Card**: A Subscriber Identity Module card is a smart card that includes but not limited to a cellphone phone number, customer identity and other data.

 g. **SD Card**: A Secure Digital Memory Card Memory is a storage device utilized in computers and/or cellular phones for additional cellular phone storage components/files compatible that frequently contain files that include but not limited to: cellular phone downloads, photos and videos.

6. Based on my training, experience, and research, I know the SUBJECT DEVICE has capabilities that include, but are not limited to: a wireless telephone; a digital camera/video recorder; a portable music/media player; and a device to send/receive emails, documents, photographs, videos and text messages. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence of drug/firearm trafficking, possession and indicia of ownership to SUBJECT DEVICE.

## PROBABLE CAUSE

A. <u>Background of the Investigation</u>

7. In September of 2016, ATF New York Group IV initiated a firearms trafficking investigation. During the investigation, law enforcement in New York performed several controlled purchases of firearms which were previously purchased in the Richmond, VA area. Law enforcement determined that Brian SAMUELS was involved with this investigation. In August of 2018, a cooperating source ("CI-1") reported to the Henrico County Police Department (HCPD) and the ATF that SAMUELS was involved in the trafficking of firearms.

8. CI-1 will be referred to in the masculine gender, regardless of CI-1's true gender. CI-1 has been convicted of two felonies, including robbery and the use of a firearm in the commission of a felony. He was arrested in December of 2017, in Henrico County, Virginia, for possession with

5

intent to distribute a schedule I or II drug (two charges), possession of weapon/ammo by a felon, and possession of a firearm by a convicted felon. CI-1 is currently supervised through the use of an ankle monitor. On January 29, 2019, ATF SAs were notified by the Henrico County Police Department that CI-1 had failed a drug test for marijuana usage.

9. In August of 2018, agents and officers associated with ATF and HCPD, began investigating SAMUELS for possible criminal offenses involving the illegal sale of firearms in the Richmond Metropolitan area. In addition to using GPS-tracking search warrants, pen register/trap and trace devices, and other investigatory techniques, the agents also utilized an ATF UC to further the investigation through firearms purchases.

10. On August 7, 2018, CI-1 stated to law enforcement that he knew SAMUELS and an associate were trafficking firearms to the Baltimore, MD area. CI-1 stated that this had been occurring while CI-1 had been incarcerated. CI-1 stated that the person to whom SAMUELS and his associate were selling firearms in Baltimore, MD had been incarcerated. Furthermore, CI-1 learned through conversation with SAMUELS that SAMUELS and his associate were looking for another purchaser of firearms. Due to SAMUELS and his associate looking for another purchaser of firearms, CI-1 introduced an ATF Special Agent, acting in an undercover (UC) capacity, to SAMUELS. The UC and CI-1 devised a story that the UC was CI-1's cousin from out of state

    B.    <u>Controlled Purchase of a firearm from Brian SAMUELS on August 28, 2018</u>

11. On August 28, 2018, at law enforcement direction, CI-1 contacted SAMUELS via SAMUELS' cellular phone and discussed a rifle with a drum style magazine SAMUELS had for sale. On August 29, 2018, an ATF UC, participated in a controlled purchase of a firearm from SAMUELS in front of 316 East 9th Street, Richmond, VA. The UC observed SAMUELS exit 316 East 9th Street, Richmond, VA, and observed SAMUELS approach the passenger side of an

undercover law enforcement vehicle (UCV). SAMUELS then produced a firearm (American Tactical Imports, Model Omni Hybrid, 5.56 X 45mm caliber semi-automatic pistol, bearing serial number NS174168) with a drum magazine from his sweat pants and provided the firearm to CI-1. SAMUELS was provided $1000.00 in pre-recorded Official Government Funds (OGF) for the purchase of this firearm

    C.    <u>Controlled purchase of a Firearm from Toreaz SETTLES on October 2, 2018</u>

12. On September 25, 2018, CI-1 provided law enforcement with information about potential firearms for sale, to include an "AK47" style rifle, from SAMUELS. CI-1 stated that the "AK47" was purchased by Adam WALLACE and Ah'Tari JOHNSON, and that SAMUELS stated he would help WALLACE and JOHNSON sell the "AK47" for a profit. On September 25, 2018, CI-1 spoke with SAMUELS via cellphone. During the conversation, CI-1 discussed with SAMUELS a "Draco" and a "Glock." CI-1 asked SAMUELS if he had ever received the "stick" from Ah'Tari JOHNSON to which SAMUELS replied that he had not and he was going to call him. SAMUELS further asked CI-1 how much he thought CI-1's associate, the UC, would pay for the "Draco" and the "Glock."

13. On October 2, 2018, at law enforcement direction, CI-1 contacted SAMUELS via cellphone in reference to the purchase of an "AK-47" style rifle. During the conversation, CI-1 told SAMUELS that his "peoples" (the UC) were ready to pick him up (referencing a previously arranged purchase of an "AK-47" style rifle). CI-1 verified with SAMUELS that SAMUELS had left "it" (referring to the firearm) with Toreaz "Longway" SETTLES. SETTLES is a known associate of SAMUELS. CI-1 also verified with SAMUELS that SETTLES was the only one at the residence. CI-1 further told SAMUELS to call Toreaz SETTLES and tell SETTLES to be ready.

14. In a separate conversation, CI-1 again spoke with SAMUELS via cell phone and SAMUELS told CI-1 to call SETTLES. CI-1 then placed a phone call to SETTLES at phone number (804) 274-0212 and CI-1 instructed SETTLES to be ready and that he was about to be on his way. SETTLES replied, "alright just call me." CI-1 further told SETTLES to make sure he had that "junk ready" to which SETTLES replied, "alright."

15. On October 2, 2018, the UC travelled with CI-1 to the area of 316 East 9th Street for the transaction. Once in the area, CI-1 called SETTLES and the UC observed SETTLES exiting the residence carrying a firearm wrapped in a blue shirt. SETTLES approached the UC vehicle and provided the firearm (Romarm/Cugir, Model GP WASR 10/63, 7.62 X 39mm semi-automatic rifle bearing serial number 1973EK2963) to CI-1. The UC provided $1200.00 in Official Government Funds (OGF) to SETTLES in exchange for the firearm.

16. On October 4, 2018, in an interview, CI-1 informed law enforcement that after the controlled purchase on October 2, 2018, SAMUELS provided CI-1 with $50.00 associated with the purchase of the AK-47 style rifle. CI-1 stated that he had already spent the $50.00 and law enforcement instructed CI-1 that if this happened in the future, to immediately notify law enforcement.

D. <u>Controlled purchase of Firearms from SAMUELS on October 15, 2018</u>

17. On October 9, 2018, the UC communicated with SAMUELS via SAMUELS' cellular phone and discussed the sale of firearms. During the conversation, the UC and SAMUELS negotiated prices of firearms that SAMUELS was willing to sell to the UC in the near future.

18. On October 15, 2018, the UC drove to the area of 316 East 9th Street, Richmond, VA with CI-1. Once in the area, the UC observed SAMUELS exit 316 East 9th Street. The UC observed SAMUELS carrying a large burgundy colored duffle bag and SAMUELS provided the duffle bag

which contained four (4) firearms to the UC.. After inspecting the firearms, the UC provided SAMUELS with $3,700 in OGF. Upon receiving the OGF, SAMUELS provided CI-1 with $300 from the OGF. Law enforcement later retook possession of this $300.00. Upon inspection of the purchased evidence, law enforcement located approximately 1.7 grams of suspected marijuana in the burgundy duffle bag. The suspected marijuana was field tested and showed an initial positive reaction for the presence of marijuana.

E. Controlled purchase of firearms from SAMUELS on October 31, 2018

19. On October 25, 2018, the UC communicated with SAMUELS via a three-way phone call with CI-1. During the conversation, SAMUELS informed the UC that he had eight (8) firearms, and was trying to obtain a total of ten (10) firearms for sale to the UC. In this same conversation on October 25, 2018, the UC asked SAMUELS if he was willing to travel to the Maryland area to sell the firearms where the UC purported to reside. SAMUELS replied that he was not yet comfortable with traveling to the Maryland area to conduct the transaction with the UC. SAMUELS added there was not a sufficient amount of "chemistry" built up between the two for him to conduct the transaction out of state with the UC. The UC and SAMUELS agreed upon a purchase price of $7,600.00 for the firearms.

20. On October 31, 2018, the UC traveled to 316 East 9th Street in Richmond, VA, and parked in the rear of the residence. The UC called SAMUELS on SAMUELS' cellular phone and advised that he had arrived at SAMUELS' residence. SAMUELS exited 316 East 9th Street, and the UC observed SAMUELS carrying a black duffle bag with a black rifle tucked under his sweater. SAMUELS placed the black duffle bag inside the UC's vehicle and the UC inventoried the firearms. Upon confirming a total of ten (10) firearms, the UC provided SAMUELS with $7,600.00 in OGF.

21. During the controlled purchase, the UC revisited a conversation that he and SAMUELS had via cellular phone on October 25, 2018. The UC informed SAMUELS that the reason SAMUELS was requested to come to Maryland to conduct the firearms transaction was due to information the UC received from CI-1 about a former firearms customer of SAMUELS in the Baltimore area who was arrested. The UC assumed SAMUELS wanted to continue trafficking firearms up north, so the UC offered to help SAMUELS continue to traffic firearms. SAMUELS asked the UC if the UC was taking the firearms purchased from SAMUELS up to New York. The UC replied that the UC was taking them there. SAMUELS replied "Yea see I ain't never take them that far. I had a plug up there at first, but he got tore off." The UC clarified to SAMUELS that the UC was not referring to SAMUELS bringing guns to New York, but was referring to SAMUELS bringing guns to the UC in Maryland. The UC further explained to SAMUELS that it was too risky for the UC to travel south. Therefore, the UC negotiated a lower price with SAMUELS. The UC also offered SAMUELS an opportunity to sell the UC firearms at a higher rate if SAMUELS sold the firearms to the UC in Maryland. SAMUELS replied he would inform the UC when he was ready.

F. <u>Controlled purchase of Firearms from Brian SAMUELS on November 16, 2018</u>

22. On November 11, 2018, the UC returned a missed call from SAMUELS on SAMUELS' cellular phone. During the conversation, SAMUELS asked the UC if the UC was interested in purchasing a "FN" firearm. SAMUELS stated he was getting the firearm brand new for $1,300.00, and wanted to know how much the UC would pay for it. The UC replied he would contact SAMUELS later with an answer. The UC asked SAMUELS if SAMUELS was available to conduct the firearm transaction on the upcoming Friday (11/16/18). SAMUELS replied he would

be available and informed the UC that SAMUELS would have more firearms waiting for the UC to purchase when they met.

23. On November 16, 2018, the UC conducted another controlled purchase with SAMUELS at the same location. After the October 31, 2018, controlled purchase, SAMUELS and the UC continued conversing via text message and phone calls about future purchases of additional firearms. In summary, those conversations involved SAMUELS informing the UC that SAMUELS wanted to sell the UC a "FN" pistol that shot rifle type ammunition; additionally, Glock firearms were more expensive for SAMUELS to purchase for the UC as SAMUELS' cost *(the amount he paid for the firearm)* was approximately $500 U.S. dollars. In the lead-up to November 16, 2018, SAMUELS and the UC texted each other and negotiated over the type and price of firearms, and the logistics of any future transaction. After much discussion, the two agreed to meet on November 16, 2018. On that date, at approximately 1506 hours, the UC and CI-1 traveled to 316 East 9th Street in Richmond, VA. The UC arrived in the rear parking lot of 316 East 9th Street and observed SAMUELS exit the rear door of 316 East 9th Street. The UC gave SAMUELS a duffle bag to place the firearms and SAMUELS took the duffle bag inside the residence. SAMUELS exited the residence and provided the UC with the duffle bag. The UC inspected the contents of the duffle bag and confirmed that there were twelve (12) firearms inside the bag. The UC then provided SAMUELS with $10,000.00 in OGF. During this controlled purchase, SAMUELS asked the UC "how far you think I gotta meet you?" The UC replied "anywhere..." The UC then suggested to SAMUELS that SAMUELS could conduct the next firearm transaction at the MGM casino located in Oxon Hill, Maryland. The UC informed SAMUELS that the UC was going to be in New Jersey for a month. SAMUELS asked if the UC was going to leave before the Thanksgiving holiday, because he wanted the UC to meet with him

one more time before the UC left for New Jersey. The UC replied that he was unable to meet with SAMUELS during that time. SAMUELS agreed to meet with the UC in Maryland.

### G. Controlled purchase of firearms from Brian SAMUELS on December 12, 2018

24. On December 12, 2018, the UC conducted another controlled purchase of firearms from SAMUELS. The UC and SAMUELS negotiated the sale of seven (7) handguns and a pistol grip shotgun. In the lead-up to this controlled purchase, the UC had phone conversations with SAMUELS negotiating the deal. In summary, SAMUELS informed the UC the he was unable to drive to Maryland to meet with the UC because SAMUELS did not have a valid driver's license at the time, and did not want to involve anyone else in the transaction. As a result, SAMUELS and the UC agreed to conduct the next firearm transaction at SAMUELS' residence. CI-1 was present with the UC for this controlled purchase, which took place at 316 East 9th Street in Richmond, VA.

### H. Controlled Purchase of Firearms from SAMUELS on January 29, 2019

25. On January 25, 2019, the ATF UC spoke with SAMUELS by cell phone. During this conversation, SAMUELS informed the UC that he needed money to pay his rent, but he was going to try to delay selling the firearms he currently had in his possession so that the UC could purchase them. The UC informed SAMUELS that the UC intended to purchase a large quantity of firearms the next time that they met. SAMUELS replied "We ain't really been getting nothing else .We probably got like, goddamn, like a couple jawns. Shit…probably like…probably like umm, 10 of them, at the least probably." The UC thanked SAMUELS for delaying sale of the firearms he had in his possession for the UC. In addition, the UC reiterated to SAMUELS that the UC wanted to purchase a larger than normal quantity of firearms from SAMUELS. SAMUELS replied "the paper

a little slow, but by the time you come this time, we gone have more for next time…niggas is broke right now."

26. On January 26, 2019, CI-1 placed a phone call to SAMUELS on SAMUELS' cell phone. CI-1 informed SAMUELS that the UC was going to front CI-1 some money in order for CI-1 to obtain firearms from SAMUELS. CI-1 also informed SAMUELS that CI-1 was wearing a GPS ankle monitor and was a felon. SAMUELS acknowledged CI-1's comments with "yeah." CI-1 then informed SAMUELS that the UC intended to give CI-1 money on Tuesday, January 29, 2019.

27. On January 26, 2019, the UC spoke with SAMUELS on SAMUELS' cell phone. During the conversation, the UC verified with SAMUELS the conversation SAMUELS had with CI-1. SAMUELS replied he spoke with CI-1 earlier. The UC and SAMUELS negotiated a price of $650.00 per handgun, and the UC offered SAMUELS an additional $100 - $150 on the total sales price of the firearms as payment for SAMUELS to hold the rest of the firearms until the UC was able to purchase them the following week.

28. On January 29, 2019, CI-1, at law enforcement's direction, conducted a controlled purchase of three (3) handguns from SAMUELS. For the controlled purchase CI-1 was provided with $2100.00 in OGF and driven to the area of 316 East 9th Street by law enforcement. Once in the area, CI-1 made contact with SAMUELS at the front door of 316 East 9th Street. At the front door, CI-1 provided SAMUELS with the $2100.00 and SAMUELS provided CI-1 with three (3) handguns. CI-1 then departed the area with law enforcement.

29. On January 30, 2019, CI-1 provided law enforcement with $400.00 in OGF from the 1/29/2019 controlled purchase. CI-1 stated that in the evening of 1/29/2019, SAMUELS provided him with the $400 for his participation in the controlled purchase. Law enforcement confirmed

that the serial numbers of the $400.00 matched serial numbers from the OGF provided to CI-1 for the controlled purchase the prior day.

30. To the present date, SAMUELS has continued to be in contact with the UC about the sale of additional firearms.

31. On February 7, 2019, during the course of SAMUELS's arrest, law enforcement located three cellular devices inside the home where SAMUELS was arrested. Other individuals in that home claimed ownership of two of these three cellular devices. The third device, the SUBJECT DEVICE, was found next to a jacket that SAMUELS admitted belonged to him. Additionally, law enforcement tracking of a cellular device known to belong to SAMUELS showed that SAMUELS's phone was turned off prior to his arrest. When law enforcement recovered SUBJECT DEVICE during SAMUELS's arrest, it, too, had been turned off.

32. In my training and experience, I know that drug and firearm traffickers frequently use cellphones to set up illegal transactions, store the contact information for buyers and suppliers, store balance sheets to keep track of drug trafficking activities, communicate with other known drug traffickers or customers to discuss illegal transactions, and send or store images documenting firearm and/or drug possession.

33. SUBJECT DEVICE is currently in secured storage at the ATF Richmond Field Office, 600 E. Main Street, Richmond, Virginia. In my training and experience, I know that the SUBJECT DEVICE have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were in when the SUBJECT DEVICE first came into the possession of the ATF.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

34. Based on my knowledge, training and experience I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. Forensic *evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE were used, the purpose of its use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

15

  evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

 e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the SUBJECT DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

37. *Manner of execution.* Because this warrant seeks only permission to examine SUBJECT DEVICE already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

38. Moreover, the Government will file a written pleading in this case within one hundred twenty (120) days after the execution of the search warrant notifying the court that the imaging process of digital evidence seized from the target location is complete, and the forensic analysis of computers and media has begun. Such notice will include confirmation that written notice has been provided to the defendant or his counsel informing the defendant that the forensic examination of evidence seized from him has actually begun. Such notice to the defendant and

the Court is not intended to mean, and should not be construed to mean, that the forensic analysis is complete, or that a written report detailing the results of the examination to date will be filed with the Court or provided to the defendant or his counsel. This notice does not create, and is not meant to create, additional discovery rights for the defendant. Rather, the sole purpose of this notice is to notify the defendant that, beyond the simple seizure of his property, a forensic search of that property has actually begun.

## CONCLUSION

39. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the SUBJECT DEVICE described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Thomas W. Byrd
Special Agent
ATF

Subscribed and sworn to before me on February 13 2019

/S/
David J. Novak
United States Magistrate Judge
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

The property to be searched is SUBJECT DEVICE (1) iPhone cellular phone IMEI #352982098938890 containing Sprint SIM card #89011202000210974124. Currently located at the ATF Richmond III Field Office, 600 E. Main Street suite 1401, Richmond, Virginia.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1. All records on the SUBJECT DEVICE described in Attachment A that relate to violation of 18 U.S.C. § 922(a)(1)(a) and 18 U.S.C. § 922(a)(5), including but not limited to:

   a. SUBJECT DEVICE user accounts/basic demographic information;

   b. contact lists;

   c. call records;

   d. call history;

   e. any information related to the purchase, possession or trafficking of firearms and/or ammunition;

   f. any information related to drug transactions, possession and drug trafficking;

   g. photographs/videos/documentation;

   h. text messages, emails, multimedia messages;

   i. web browser history;

   j. Balance sheets;

   k. Tower data;

   l. All data and contents of the SUBJECT DEVICE.

2. Evidence of user attribution showing who used or owned the SUBJECT DEVICE at the time the things described in this warrant occurred, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.